# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BRANDON C. MCDUFFIE,<br><br>       Plaintiff,<br><br>v.<br><br>WILLIAM SWIEKATOWSKI,<br><br>       Defendant. | Case No. 17-CV-984-JPS<br><br><br>**ORDER** |

    Plaintiff Brandon McDuffie ("McDuffie"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendant William Swiekatowski ("Swiekatowski"), a correctional officer. McDuffie attempted suicide on February 14, 2017 by climbing onto a ventilation duct in the prison and threatening to jump. Correctional officers tried to coax him down verbally but were unsuccessful. Eventually, Swiekatowski shot McDuffie with a pepperball gun in order to encourage him to descend.

    In this suit, McDuffie alleges that Swiekatowski violated his rights under the Eighth Amendment by using excessive force against him and by acting with deliberate indifference to his serious medical needs, namely his suicidality. Swiekatowski has filed a motion for summary judgment as to each of McDuffie's claims. (Docket #33). That motion is fully briefed and, for the reasons stated below, it will be granted.[1]

---

    [1]Although he asks the Court to dismiss this case in its entirety, Swiekatowski does not expressly address the medical deliberate indifference claim in his briefing. *See* (Docket #34, 44). It seems he overlooked the fact that the Court allowed McDuffie to proceed on such a claim in addition to the excessive force claim. (Docket #20). This oversight matters little, as McDuffie has offered

1. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

2. **RELEVANT FACTS**[2]

McDuffie is a Wisconsin prisoner housed at Green Bay Correctional

---

his arguments in support of his deliberate indifference claim, (Docket #42 at 12–16), and the resolution of each claim rests on the same body of undisputed facts, *see* Fed. R. Civ. P. 56(f)(3).

[2]Many of McDuffie's attempts to dispute Swiekatowski's proffered facts are unavailing, as he failed to cite admissible evidence contradicting Swiekatowski's factual assertions. *See, e.g.*, (Docket #45 ¶ 7); Fed. R. Civ. P. 56(c)(1), (e). Additionally, McDuffie often tried to dispute the facts by writing the word "Dispute" in his response to Swiekatowski's statement of facts along with a citation to his affidavit or other evidence. *See, e.g.*, (Docket #45 ¶ 8). This was the wrong way for McDuffie to raise disputes of fact, but in view of his *pro se* status, and because McDuffie's claims must be dismissed anyway, the Court generously reviewed each of McDuffie's submissions to uncover his version of the facts to the extent it is supported by admissible evidence.

Institution ("GBCI"). At the time of the events in question, Swiekatowski was a correctional officer at GBCI with the rank of captain.

On February 14, 2017, at approximately 5:42 p.m., the GBCI communications center, commonly referred to as "control," called for first responders to report to the South Cell Hall. South Cell Hall consists of four tiers: E-tier, the ground floor; F-tier, the second floor; G-tier, the third floor; and H-tier, the top floor. Cells run along one side of the hall, with a walkway in front of them. There is an open space between the walkway and the wall opposite the cells which spans the entire height of the hall.

McDuffie had jumped from the walkway on F-tier onto the supervisor's secure area, called the "sergeant's cage," and then onto the ventilation shaft which ran along the opposite wall. The ventilation shaft was approximately thirty inches wide, twenty feet long, and ten feet off the ground.[3] McDuffie says he did this because he had a mental break and was attempting to commit suicide by jumping onto the ventilation system and then to his death. At the time McDuffie jumped onto the ventilation duct, many South Cell Hall inmates were returning from the evening meal.

Lieutenant Timothy Retzlaff ("Retzlaff") responded to South Cell Hall, stood on E-tier, looked up, and talked to McDuffie, who was on the ventilation unit directly above. Mattresses were placed on the floor below McDuffie in case he fell or jumped. At 5:48 p.m., GBCI nurse Steven Bost ("Bost") arrived to provide any needed medical care. Other South Cell

---

[3]McDuffie maintains it was "three stories" off the ground, not ten feet. (Docket #43 ¶ 22). But he does not challenge the authenticity of the video footage Swiekatowski submitted in connection with his motion, and the video indisputably shows that Swiekatowski is correct. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The video footage, which also has an audio component, is conclusive as to the matters it depicts, forestalling any genuine dispute as to such matters. *Id.*

Hall inmates were walked back to the unit and locked inside their cells in order to secure the area, allow staff to concentrate on bringing McDuffie down from the ventilation system, and minimize the chance that other inmates may interfere with that effort.

Swiekatowski also responded to the area at this time, was briefed by Retzlaff, and then consulted with Deputy Warden Schueler ("Schueler") regarding the incident. They decided to call for Sergeant Antonio Cummings ("Cummings") to speak with McDuffie and try to convince him to come down. As a member of the GBCI crisis negotiations team, Cummings has received specialized training regarding de-escalation techniques and using negotiation to resolve crisis situations. Swiekatowski is not trained in crisis negotiations.

Cummings reported to the South Cell Hall around 5:50 p.m. He walked up to the F-tier walkway directly across from McDuffie, who at that point was sitting on the duct work, and began to speak with him. According to Cummings, McDuffie said he wanted to kill himself because he had long sought help from psychological services staff to no avail. At approximately 6:11 p.m., an extension ladder was placed against the duct near McDuffie to provide him a safe way to climb down. Cummings' initial attempts to persuade McDuffie to voluntarily climb down lasted approximately thirty minutes. McDuffie reports that inmates and correctional officers, including Cummings, were able to calm him down by speaking with him.

Swiekatowski then came to F-tier at 6:20 p.m. to check on the progress of negotiations. Cummings believed he was making headway, but McDuffie appeared to change his mind when Swiekatowski arrived. Cummings informed Swiekatowski how upset McDuffie was, that he

wanted to talk to psychological services staff, and that he wanted to kill himself.

McDuffie accuses Swiekatowski of "re-escalat[ing] the situation" and derailing efforts to calm him down by "making aggressive statements and verbal threats, causing [him] to relapse into mental distress." (Docket #43 ¶ 14). Specifically, McDuffie avers that

> Swiekatowski engaged me and after I told him I wanted to kill myself, he became sarcastic as if he could care less [and] then said, "ok yeah, get down." I became agitated and told him "you don't give a fuck if I die or not," and he continued with the sarcasm before telling me, "alright that's enough, either you get down or I'm gonna get a ladder, come up there and make you get down," which caused me to explode with emotions I fought hard to control and told Swiekatowski to "get psych or I'm gonna jump over the mats and kill myself," and Swiekatowski told me "no" and "no one is coming," then walked away.

*Id.* ¶ 17.

Swiekatowski then left South Cell Hall to update Schueler. With Swiekatowski away, Cummings and Retzlaff continued negotiations with McDuffie but, according to them, they made no progress. McDuffie says that Cummings was trying to reverse the "psychological damage" inflicted by Swiekatowski but that he was too far gone into the "stream of emotions" giving rise to his suicidality. *Id.* ¶ 19.

At approximately 6:35 p.m., McDuffie began banging his fist against the ventilation system. Staff did not climb the ladder to bring McDuffie down due to concern that McDuffie had the advantage of being in an elevated position and could assault officers as they climbed. Staff

were also concerned that if they were able to successfully climb the ladder, the extra weight on the duct might cause it to collapse.[4]

Cummings continued to reason with McDuffie to persuade him to voluntarily climb down. Once again, his attempts failed. Swiekatowski decided to use physical force to persuade McDuffie to come down. Swiekatowski says he was motivated by a need to ensure McDuffie's safety and abate the situation, which was agitating the other inmates. McDuffie disagrees, saying the Swiekatowski wanted to punish McDuffie for having an episode of mental illness and for holding up the dinner service and showers.

While conversing with Schueler, Swiekatowski explained that they were not making any progress getting McDuffie to come down voluntarily and suggested bringing the pepperball gun as a means to gain compliance. The pepperball gun is a non-lethal high-pressure air launcher that fires a fragile projectile containing a powdered chemical, called "OC powder," that can irritate the eyes and nose in a manner similar to pepper spray. As a part of his training, Swiekatowski was shot with the pepperball gun, and he found it to be very similar to being shot with a paintball gun.

At this time, Swiekatowski had another officer start taking video footage of the situation. At the start of the video, Swiekatowski, standing in a security office, provides a brief to the viewer, stating that he was given permission by Schueler to use the pepperball gun on McDuffie. This

---

[4]Swiekatowski asserts that he went back to South Cell Hall to speak with McDuffie again around this time, that he instructed McDuffie to come down, and that McDuffie refused. McDuffie counters that this second visit by Swiekatowski did not actually occur. He maintains that Swiekatowski only came to South Cell Hall twice—the first encounter already described and the second in which he shot McDuffie with the pepperball gun, which will be detailed below.

option was chosen as it would not incapacitate McDuffie to the point that he may fall and injure himself, but would make him uncomfortable due to the impact of the projectile and the effects of the OC powder. Swiekatowski and Schueler were concerned that if the OC chemical was deployed using a streamer or fogger—called a "Projectojet"—it would contaminate the entire unit and might incapacitate McDuffie to the point that he would fall. Similarly, because incapacitation might lead to a fall, a taser was also not an option.[5]

Swiekatowski retrieved the pepperball gun, the Projectojet, and masks. Officers held the Projectojet with them as a show of force only. At approximately 6:43 p.m., an hour after McDuffie had jumped onto the ventilation shaft, Swiekatowski, carrying the pepperball gun and followed by the officer operating the video camera, proceeded up to F-tier in South Cell Hall. Swiekatowski then briefed the nurse, Bost, of his plan to use the pepperball gun. As the video depicts, during the officers' entire interaction with McDuffie, other inmates were locked in their cells but were observing the situation and offering a near-constant stream of angry shouting and epithets directed at the officers.

Shortly after Swiekatowski's arrival, Cummings left the area because his attempts at gaining voluntary compliance had failed. McDuffie asked who was coming up onto the vent with him. Staff informed him no one was going to do that and again asked him to come down. McDuffie then stated "let's rock" and asked again "who's coming up?" Swiekatowski repeatedly ordered McDuffie to come down

---

[5]Swiekatowski avers that if McDuffie had not come down voluntarily, the only other option to safely bring McDuffie down would have been to construct scaffolding next to the vent, send staff up to McDuffie's level, and physically wrestle McDuffie. This option would have been very risky, to say the least.

voluntarily, but he refused. He continued to challenge Swiekatowski to come up the ladder, stating, "the difference between me and you is I ain't scared. Let's do this," "I ain't got nothing to lose," "get Ski up here," and "I am going to show him that he ain't bulletproof like he claim he is."

Due to McDuffie's continued refusal to comply with directives, Swiekatowski aimed the pepperball gun at him and continued to order him to come down. McDuffie gave no reaction whatsoever. Swiekatowski then fired a burst of approximately six rounds that struck McDuffie in the chest area. They had little to no effect.

Swiekatowski then targeted McDuffie's thigh and left knee area with another six rounds. The video shows that McDuffie hardly reacts except to slightly turn his body away from Swiekatowski. He then exclaims, "you just shot me," but his response is one of umbrage, not physical distress. Indeed, he proceeds to argue with Swiekatowski in a defiant tone, apparently unaffected by the projectiles' impact or the OC powder.

Swiekatowski then shot McDuffie twice more in the leg in an effort to get him to come down, but he still refused. McDuffie told Swiekatowski that he had asthma and that he could not breathe. McDuffie says that Swiekatowski already knew he was asthmatic and knew that the OC powder would have a strong adverse effect on him. Yet McDuffie's physical comportment and continued arguing with Swiekatowski did not reflect his reported breathing difficulty.

Swiekatowski continued to instruct McDuffie to descend from the ventilation shaft, and inmates continued to shout at Swiekatowski and the other officers. McDuffie remained disobedient, continuously replying to each of Swiekatowski's orders, "you just shot me." McDuffie then told

Swiekatowski to "go get some real bullets" because he was "ready to die." McDuffie stated that he was not scared to die because he had "lost everything." McDuffie explained that he planned to remain on the shaft until he could no longer breathe from the OC powder.

McDuffie continued shouting at Swiekatowski and staff to come up the ladder and refused repeated directives to come down. He even taunted Swiekatowski, saying "are you scared?" when Swiekatowski refused to come up onto the duct. McDuffie proceeded to complain about being shot and stated his desire to harm Swiekatowski should he join McDuffie on the ventilation shaft.

McDuffie then told Swiekatowski to call "psych" or he was going to jump. There were no psychological services staff present at the institution at the time of this incident, as it was too late in the evening. Swiekatowski informed McDuffie of this and gave McDuffie further orders to go to the ladder and come down. McDuffie reported ongoing respiratory distress and became more agitated, exclaiming epithets at Swiekatowski while repeating his requests for psychological care.

As McDuffie seemed particularly distressed by Swiekatowski's presence, blaming him for derailing Cumming's progress, Swiekatowski decided it might calm McDuffie if he left the area. Swiekatowski left to monitor the situation from control and requested that Cummings resume negotiations.

Cummings and Retzlaff returned and again tried to persuade McDuffie to climb down voluntarily. McDuffie became very agitated for a time, and tears were visible on his face. He continued to scream about being repeatedly denied the psychological help he had requested, saying "I'm tired" over and over again. Eventually, Retzlaff asked McDuffie to

come down so they could talk further, and McDuffie replied that he wanted "out of here then. I want out of here." Retzlaff informed McDuffie that they could not talk about that while he was sitting on the duct. Retzlaff and Cummings talked about options for help when McDuffie needed it and continued to ask McDuffie to come down.

McDuffie finally agreed to climb down on the condition that only Retzlaff and Cummings handle his restraint placement and escort out of the unit. They agreed and McDuffie climbed down the ladder at approximately 7:06 p.m. Thus, McDuffie was on the ventilation shaft for nearly one and a half hours.

Cummings and Retzlaff secured McDuffie in handcuffs and took him to the health services unit for a medical assessment. Bost examined him. Bost observed swelling in the knee area and told McDuffie he would be given ice and ibuprofen. McDuffie did not make any complaints of breathing problems during this assessment. However, McDuffie now explains that he had "at least 21 bruises on [his] swollen thigh and a large knot on [his] left knee cap," while "the brief walk outside" to the health services unit "kinda helped with my breathing to the point I felt I could manage." (Docket #43 ¶ 30). McDuffie claims that he must permanently wear a left knee brace in order to walk and has a medical restriction to that effect.

Retzlaff conferred with GBCI's on-call psychologist, Dr. Amy Zirbel, after McDuffie descended from the duct. Based on that conversation, McDuffie was placed on observation status in the restricted housing unit. Observation status is a very restrictive form of confinement used to prevent an inmate from harming himself or others. Inmates in observation are closely monitored by security and psychological services

staff and have most of their personal effects, clothing, and bedding taken away. Staff visually check on an observation status inmate every fifteen minutes to make sure he is not harming himself or in distress.

While being placed in observation, McDuffie asked Retzlaff why Swiekatowski had shot him. Retzlaff replied, "I have no idea but I'll be sure to have him come up tonight and tell you because he is working a double." *Id.* ¶ 31. Swiekatowski and McDuffie did speak that night. Swiekatowski claims he spoke to McDuffie only once, at 1:11 a.m., and explained that he shot McDuffie because McDuffie was not allowed on the vents, his behavior posed a safety risk, and staff could not allow him to stay up there indefinitely. Further, while he was on the duct, staff had to lock all inmates in the unit in their cells in order to secure the area. Resolving the incident with him would have allowed staff to continue with their regular activities, including completing showers for the inmates. McDuffie maintains that Swiekatowski came to see him a second time that night, at 1:53 a.m., and at that time he said only that he shot McDuffie "because we had to get showers done and you already held up dinner." *Id.*[6]

3.  **ANALYSIS**

McDuffie says that Swiekatowski's conduct amounted to both excessive force and deliberate indifference to his serious medical needs, both in violation his rights under the Eighth Amendment. The Court will consider each claim in turn.

---

[6]Prison records do not reflect that this second visit occurred, but the Court accepts that it did out of appreciation for the standard of review applied at summary judgment.

### 3.1 Excessive Force

First is McDuffie's claim that Swiekatowski's use of the pepperball gun rose to the level of excessive force. The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). When a prison official is accused of using excessive force, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010). Several factors can inform this determination, including the need for force, the amount applied, the threat the officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner. *Hudson*, 503 U.S. at 7; *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004).

The Supreme Court has instructed that the question is not whether the force employed, viewed with the benefit of hindsight, was appropriate, but whether it was motivated by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). As a result, on summary judgment "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives. Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury." *Id.* at 322.

Here, it is uncontested that McDuffie caused a major disturbance by leaping from a second-floor walkway onto the ventilation system. This

was not something he was permitted to do, it placed him at great physical risk, and it arrested the attention of both nearby inmates and correctional officers. McDuffie's conduct necessitated a response from correctional officers, who are charged with the unenviable task of maintaining order and discipline in the prison environment. The officers negotiated with McDuffie for over an hour and gave repeated verbal direction for him to descend. He refused each time. They then made a show of force with the Projectojet and pepperball gun and repeated their requests for compliance. Again, it had no effect. All the while, other inmates in the hall became more agitated and aggressive. This is just the sort of blatantly insubordinate and dangerous conduct, coupled with ever-more-chaotic conditions, that warranted the judicious application of force.

As the undisputed facts make clear, Swiekatowski only applied physical force when lesser measures proved ineffective. As such, this case is analogous to *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012). There, the officer first ordered the inmate to "get against the wall," which the inmate refused to do. *Id.* at 1045. The officer bent the inmate's wrist, but still the inmate did not comply. *Id.* Finally, he "slammed" the inmate against the wall. *Id.* The Seventh Circuit did not find this use of force excessive, observing that the officer "did not use any force until [the inmate] disobeyed a command that was designed to maintain order within the prison; and, when [he] applied modest force, [the inmate] remained defiant. [The officer] did not violate the Constitution by applying additional force." *Id.* at 1046.

Of course, this case is different from *Guitron* in that Swiekatowski did not graduate from lesser to greater forms of physical force; the only force he applied was the pepperball gun. But what matters is that here, as

in *Guitron*, lesser forms of coercion were ignored. After an hour of verbal negotiations, officers made a show of force with the Projectojet and pepperball gun. When that show of force also failed, there was no way to apply physical force to McDuffie while perched on the ventilation system other than with a projectile. Although the pepper balls admittedly cause pain and discomfort, their use was not unjustified under these circumstances. Indeed, other options, like the Projectojet or taser, would have placed McDuffie at even greater risk because they were less controlled than the pepperball gun. Similarly, joining McDuffie on the duct would have been exceedingly dangerous given his agitated state and belligerent statements. Thus, while McDuffie complains that he can no longer walk without a knee brace, it is hard to charge Swiekatowski with choosing an overly severe form of force under these peculiar circumstances.

McDuffie believes that other, non-force measures would have been more appropriate, including permitting verbal negotiations to continue with Cummings, a trained crisis negotiator, or obtaining the help of psychological services staff. McDuffie contends that Swiekatowski did nearly everything wrong, from being sarcastic and callous toward his suicidality, to refusing his requests for psychological services staff, to shooting him, an asthmatic, with a pepperball gun while he was atop an unstable ventilation duct. (Docket #43 ¶ 33). All this, says McDuffie, was done in retaliation for the onset of his mental illness, something he cannot control, and was inconsistent with crisis negotiation practices. *Id.* In McDuffie's view, this incident was a psychological clinical emergency that should have been dealt with by mental health professionals.

But the Eighth Amendment is not concerned with what the best approach would have been in a given situation. Indeed, it is not even concerned with whether Swiekatowski's use of force was objectively reasonable, except to the extent that the reasonableness of his actions reflects his subjective intent. *Whitley*, 475 U.S. at 322. In this case, those objective considerations demonstrate that Swiekatowski's conduct, under the strain of the situation, was within the permissible bounds of his discretion, notwithstanding his purportedly sarcastic tone. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (noting that "[p]rison administrators…should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). As the Supreme Court explained in *Whitley*, when facing prison disturbances, officers are often forced into "decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley*, 475 U.S. at 320. Courts are ill-suited to sit in judgment of those decisions. In McDuffie's case, no reasonable jury could infer from the undisputed facts that Swiekatowski's conduct was animated by a malicious desire to cause McDuffie harm. *Id.* at 322.

Certainly, this case is nothing like *Thomas v. Bryant*, 614 F.3d 1288, 1303–04 (11th Cir. 2010), cited by McDuffie, where officers aggravated a prisoner's mental instability by spraying him with chemical agents while he was secured in his cell. Even there, the court emphasized that the use of chemical agents is not *per se* unconstitutional. *Id.* at 1310 (citing *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)). Here, by contrast, McDuffie's conduct created a palpable, ongoing risk to his safety, the safety of institution staff, and the order and discipline of the entire institution.

Taking McDuffie at his word that his conduct was the result of a mental breakdown and was not meant to cause a disturbance, *see* (Docket #43 ¶ 35), the presence of mental illness in the churn of the incident does not conclusively determine whether Swiekatowski acted appropriately.

Similarly, while McDuffie accuses Swiekatowski of violating prison policy regarding how to deal with inmates who threaten self-harm, including the need to reach out to psychological services staff, *id.* ¶¶ 36, 54, violation of prison policy is not, on its own, a violation of the Constitution, *Lewis v. Richards*, 107 F.3d 549, 553 n.5 (7th Cir. 1997); *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996). Under these circumstances, Swiekatowski's approach was not unwarranted despite any claimed variance with standard prison rules.

Finally, the Court finds unavailing McDuffie's reliance on Swiekatowski's late-night admission that he only shot McDuffie because he had held up dinner service and showers. The objective indicia regarding the use of force as the incident actually unfolded tell a far different tale. In any event, Swiekatowski's stated reasons conform to the permissible purposes of restoring order and function in the institution. As a result, no reasonable jury could conclude that the use of force was undertaken maliciously to cause McDuffie harm rather than in a good-faith effort to derail his suicide attempt and restore institutional order. *Hudson*, 503 U.S. at 7. McDuffie's excessive force claim is without merit.

### 3.2 Deliberate Indifference to Serious Medical Needs

McDuffie raises one other claim, arguing that Swiekatowski acted with deliberate indifference to his serious medical needs. To prove this, McDuffie must show: (1) that he suffered from an objectively serious medical condition; (2) that Swiekatowski knew of the condition and was

deliberately indifferent in treating it; and (3) this indifference caused McDuffie some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). On the first, element, the parties agree that suicidality is a serious medical need. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). Their dispute relates instead to whether Swiekatowski's actions evince deliberate indifference to that condition.

The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)); *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000); *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005). This is a heavy burden; the Seventh Circuit has emphasized that deliberate indifference "comprehends more than mere negligence but less than the purposeful or knowing infliction of harm." *Estate of Novack*, 226 F.3d at 529; *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002). Indeed, the Court of Appeals has characterized the required showing "as 'something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks.'" *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992)). The operative inquiry is not whether the inmate believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires.").

McDuffie's evidence does not permit the inference that Swiekatowski acted with deliberate indifference to his suicidality.[7] First, unlike many deliberate indifference claims, here one must appreciate the context in which the alleged indifference arose: a dangerous disturbance by an inmate who jumped onto a ventilation shaft as part of a suicide attempt. No one would praise Swiekatowski's sarcastic commentary during his first interaction with McDuffie, but in the heated and risky circumstances presented, the Court cannot say that this amounted to deliberate indifference. Notably, Swiekatowski did not simply walk away and ignore McDuffie; instead, he and the other officers continued their efforts to dissuade McDuffie from his suicide attempt while maintaining safety and order.

Further, Swiekatowski's refusal to summon psychological services staff and his use of the pepperball gun were not motivated by deliberate indifference to McDuffie's suicidality. Rather than punish McDuffie for a psychotic break, Swiekatowski faced the difficult task of regaining institutional order and simultaneously ensuring the safety of McDuffie and prison staff. McDuffie does not complain that he was denied additional psychological treatment after this incident, whether by Swiekatowski or anyone else. *See Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (non-medical correctional staff may rely on expert care afforded by medical professionals so long as the correctional staff does not entirely ignore the prisoner).

---

[7]In his summary judgment briefing, McDuffie at times suggests that he wants to hold Swiekatowski responsible for aggravating his asthma condition with the OC powder, but he never previously framed his deliberate-indifference claim as pertaining to his asthma. He cannot switch horses at this late juncture. *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002); *EEOC v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008).

As with his excessive force claim, here McDuffie leans heavily on his allegation that Swiekatowski violated prison policy by failing to call the psychological services staff upon request. But, as before, deliberate indifference does not arise from a violation of prison policy standing alone. *Lewis*, 107 F.3d at 553 n.5; *Langston*, 100 F.3d at 1238. McDuffie must do more than line up Swiekatowski's conduct against the prison handbook. *See Gayton*, 593 F.3d at 622–23 (nurse not deliberately indifferent by failing to follow protocol when she responded reasonably to the inmate's complaints). Under the circumstances, it was sufficient that Swiekatowski made an effort to restore prison discipline while at the same time preventing McDuffie from harming himself or others. *See Bowers v. Pollard*, 602 F. Supp. 2d 977, 993 (E.D. Wis. 2009) (noting that a suicidal inmate presents prison officials with "a dilemma with no easy options"). He may have harbored more concern for McDuffie's disobedience than his suicidality, but McDuffie's claim cannot rest solely on the idea that Swiekatowski was not sufficiently sensitive. *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004) (prison officials are not required to perform their duties "flawlessly"). The Court cannot say that McDuffie's desired response was the only way for Swiekatowski to reasonably respond to his suicide risk.

At a minimum, Swiekatowski's decisions were neither reckless, nor did they display anything approaching total unconcern for McDuffie's safety. *Collins*, 462 F.3d at 762. No reasonable jury could find otherwise.

4. **CONCLUSION**

McDuffie could not hold his institution hostage, creating a major and dangerous disturbance, and then dictate the terms of engagement. The undisputed facts demonstrate that Swiekatowski did not violate

McDuffie's constitutional rights during the February 14, 2017 incident. As a result, his claims must be dismissed.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #33) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27th day of June, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge